

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 2-08-356-CR

EDWARD VANEGAS                                                    APPELLANT

V.

THE STATE OF TEXAS                                                      STATE

------------

FROM THE 367TH DISTRICT COURT OF DENTON COUNTY

------------

## MEMORANDUM OPINION[1]

------------

**Introduction**

Appellant Edward Vanegas appeals his first-degree felony convictions for

two counts of possession of a controlled substance with the intent to deliver.

*See* Tex. Health & Safety Code Ann. § 481.112(a), (d) (Vernon Supp. 2009).

In four issues, he contends that the evidence is legally and factually insufficient

---

[1] *See* Tex. R. App. P. 47.4.

to support his convictions, that the trial court abused its discretion by refusing his request for additional time to retain trial counsel of his choice, and that the trial court abused its discretion by admitting the testimony of a Child Protective Services (CPS) investigator. We affirm.

**Background Facts**

Terry Dart and his son, Clint, are notable drug dealers in Denton County. Terry and Clint both have significant criminal histories.

In January 2008, the Denton County Sheriff's Office (DCSO) executed a search warrant at Terry's house, found cocaine, and arrested Terry. Clint arrived at the scene, and he eventually told the police that in exchange for their leniency on Terry and for their assistance through a recommendation to the prosecutors on his own pending drug case, he would help them set up Terry's drug distributor, Vanegas, for a drug bust. DCSO Officer Shane Norie, a narcotics investigator, testified that he never submitted Terry's case for prosecution but that if the case had been submitted, Terry could have received up to a life sentence. Clint also agreed to help officers make cases against two or three other individuals.

Clint met Officer Norie at a Wal-Mart on the afternoon of February 8, 2008. Officer Norie searched Clint and Clint's pickup when Clint arrived to ensure that Clint did not bring any drugs to the Wal-Mart. Clint and Officer

2

Norie went inside the Wal-Mart and sat together in the Wal-Mart's McDonald's restaurant.

Several other police officers, including DCSO Sergeant Jeff Davis, also arrived at the Wal-Mart at around 2 p.m. and remained in the parking lot to act as a surveillance and arrest team. Clint placed a short telephone call to Vanegas; a digital device recorded the call.

The recording begins with Officer Norie explaining the purpose of Clint's call to Vanegas as "an attempt to arrange for the quantity of cocaine and the quantity of methamphetamine." The call then begins by Clint telling Vanegas, "I went and got my check cashed, and I got my money." Later in the call, Clint told Vanegas where he was and that he wanted "a half onion[2] of meth and give me an ounce of coke too—I've got twenty-five hundred on me." Vanegas responded, "I probably only have like a quarter on me." Clint said, "I'll take whatever you can get." Vanegas said, "Okay," and then he told Clint that he would arrive at the Wal-Mart in thirty to forty-five minutes. Clint told Vanegas, "When you call, I'll just come out and jump in your car." Vanegas said, "Allright, cool."

---

2 "Onion" is slang for an ounce; half an onion is half an ounce, or around fourteen grams.

Clint stayed with Officer Norie in the McDonald's restaurant until Vanegas arrived at the Wal-Mart at around 4 p.m. Vanegas called Clint, and Clint left the Wal-Mart store and walked through the parking lot about thirty yards toward Vanegas's car without Officer Norie.[3] Vanegas got out of his vehicle, and he and Clint had a brief conversation. They walked over to the driver's side of Clint's pickup, and Clint opened the door. Sergeant Davis drove his car up to the bumper of Clint's pickup, got out of the car, identified himself, and told Vanegas to show his hands. Vanegas looked at Sergeant Davis, looked away from Sergeant Davis, and then "reache[d] with a closed [left] hand inside the vehicle and immediately [brought] his hand back out." Sergeant Davis then took control of Vanegas, who did not resist; while Sergeant Davis was doing so, he saw two baggies containing drugs in Clint's pickup. One baggie

---

[3] Officer Norie remained inside the Wal-Mart until the "deal was done." Sergeant Davis described the "buy-bust" plan as follows:

The way it was supposed to happen [was] Investigator Norie and Clint Dart were supposed to be positioned inside the Wal-Mart store. When Edward Vanegas arrived at the location and called and said ["]I'm here,["] Clint Dart was going to exit the Wal-Mart, contact Edward Vanegas, confirm that the drug exhibits were present, and at that time give a bust signal, which in this case I believe was opening a toolbox in the back of his truck, which would give us a signal that, okay, the dope is there and it's time to move in. We were going to block the vehicle from the front and the back, as we usually do to prevent their escape, and effect the arrest of the driver, Mr. Vanegas.

contained approximately seven grams of methamphetamine, and the other baggie contained approximately fifteen grams of cocaine.[4]

The officers did not find any weapons on Vanegas or in his car. They spoke to the people in Vanegas's car, and they noticed a child in the car.

Danny Roberts, a CPS investigator, spoke with Vanegas around 6 p.m. on the night of his arrest. For safety purposes, a police officer accompanied Roberts during his interview with Vanegas. Roberts expressed his understanding that Vanegas had been arrested for selling drugs, and Vanegas told Roberts that "he had picked up his son from [Vanegas's] mother . . .[,] [a]nd then he went to Wal-Mart to do the delivery with his son present."[5]

In May 2008, a Denton County grand jury indicted Vanegas for two counts of possession of a controlled substance with the intent to deliver. Count one of the indictment concerned Vanegas's intent to deliver methamphetamine of an amount between four and two hundred grams, and count two regarded his intent to deliver cocaine of that same amount.

---

[4] A forensic scientist later confirmed the character of the methamphetamine and cocaine and the approximate weight of the substances (subtracting the weight of the baggies themselves).

[5] The child that was with Vanegas upon his arrest was not Vanegas's biological son.

Vanegas pled not guilty before a jury in October 2008.  After the State presented its evidence, the parties rested and submitted closing arguments. The jury found Vanegas guilty of the charges contained in both counts of the indictment.   After the parties presented evidence regarding Vanegas's punishment, the jury assessed thirty years' confinement on each count. Vanegas filed notice of this appeal.

**Evidentiary Sufficiency**

In his first two issues, Vanegas asserts that the evidence is legally and factually insufficient to support his conviction for possession with intent to deliver methamphetamine and cocaine.  In a possession-with-intent-to-deliver case, the State must prove through direct or circumstantial evidence that the defendant (1) exercised care, custody, control, or management over the controlled substance, (2) intended to deliver the controlled substance to another, and (3) knew that the substance in his possession was a controlled substance.  *Poindexter v. State*, 153 S.W.3d 402, 405–06 (Tex. Crim. App. 2005); *Nhem v. State*, 129 S.W.3d 696, 699 (Tex. App.—Houston [1st Dist.] 2004, no pet.); *see* Tex. Health & Safety Code Ann. § 481.002(38) (Vernon Supp. 2009), § 481.112(a). Vanegas contends that the evidence is insufficient to support his conviction because it allegedly fails to establish that he

knowingly possessed the drugs by having  custody or control of them or that he intended to deliver them.

**Standards of review**

### Legal sufficiency

In reviewing the legal sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the prosecution in order to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).  This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.  *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Clayton*, 235 S.W.3d at 778.

The trier of fact is the sole judge of the weight and credibility of the evidence.  *See* Tex. Code Crim. Proc. Ann. art. 38.04 (Vernon 1979); *Brown v. State*, 270 S.W.3d 564, 568 (Tex. Crim. App. 2008), *cert. denied*, 129 S. Ct. 2075 (2009).  Thus, when performing a legal sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder.  *Dewberry v. State*, 4 S.W.3d 735, 740

7

(Tex. Crim. App. 1999), *cert. denied*, 529 U.S. 1131 (2000). Instead, we "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Hooper v. State*, 214 S.W.3d 9, 16–17 (Tex. Crim. App. 2007). We must presume that the factfinder resolved any conflicting inferences in favor of the prosecution and defer to that resolution. *Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Clayton*, 235 S.W.3d at 778. The standard of review is the same for direct and circumstantial evidence cases; circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor. *Clayton*, 235 S.W.3d at 778; *Hooper*, 214 S.W.3d at 13.

**Factual sufficiency**

When reviewing the factual sufficiency of the evidence to support a conviction, we view all the evidence in a neutral light, favoring neither party. *Neal v. State*, 256 S.W.3d 264, 275 (Tex. Crim. App. 2008), *cert. denied*, 129 S. Ct. 1037 (2009); *Watson v. State*, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006). We then ask whether the evidence supporting the conviction, although legally sufficient, is nevertheless so weak that the factfinder's determination is clearly wrong and manifestly unjust or whether conflicting evidence so greatly outweighs the evidence supporting the conviction that the factfinder's determination is manifestly unjust. *Lancon v. State*, 253 S.W.3d 699, 704

8

(Tex. Crim. App. 2008); *Watson*, 204 S.W.3d at 414–15, 417. To reverse under the second ground, we must determine, with some objective basis in the record, that the great weight and preponderance of all the evidence, although legally sufficient, contradicts the verdict. *Watson*, 204 S.W.3d at 417.

In determining whether the evidence is factually insufficient to support a conviction that is nevertheless supported by legally sufficient evidence, it is not enough that this court "harbor a subjective level of reasonable doubt to overturn [the] conviction." *Id*. We cannot conclude that a conviction is clearly wrong or manifestly unjust simply because we would have decided differently than the jury or because we disagree with the jury's resolution of a conflict in the evidence. *Id*. We may not simply substitute our judgment for the factfinder's. *Johnson v. State*, 23 S.W.3d 1, 12 (Tex. Crim. App. 2000); *Cain v. State*, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997).

**Analysis**

"When the accused is not in exclusive possession of the place where [drugs are] found, it cannot be concluded that the accused had knowledge of and control over the contraband unless there are additional independent facts and circumstances which affirmatively link the accused to the contraband." *Deshong v. State*, 625 S.W.2d 327, 329 (Tex. Crim. App. [Panel Op.] 1981). The "affirmative links" analysis requires direct or circumstantial evidence that

9

the defendant's connection with the drugs was "more than just fortuitous." *Brown v. State*, 911 S.W.2d 744, 747 (Tex. Crim. App. 1995); *see Poindexter*, 153 S.W.3d at 406.

Vanegas was not in exclusive possession of Clint's pickup, so we must determine whether there are sufficient links from Vanegas to the drugs. He asserts that the links are "essentially absent" because the "only factors tending to link [him] to the [drugs] consist of his nearby presence" when they were found.

But this is not a case, like the case relied on for comparison in Vanegas's brief, in which the only essential connection of a defendant to drugs was the defendant's physical proximity to them. *See Molina v. State*, Nos. 205-03, 206-03, 2003 WL 22250391, at *1–4 (Tex. Crim. App. Oct. 1, 2003) (not designated for publication). Instead, Vanegas was not only present when the drugs were found, but also (1) the drugs were in plain view in an area (Clint's truck) that Vanegas was very close to; (2) Vanegas made incriminating statements to Roberts, the CPS investigator, following his arrest; and (3) Vanegas's conduct of reaching in the pickup with his closed hand and then immediately bringing his hand back out after Sergeant Davis told him to put his hands up indicated Vanegas's consciousness of guilt. *See Tucker v. State*, 183

10

S.W.3d 501, 510 (Tex. App.—Fort Worth 2005, no pet.) (listing factors relevant to an affirmative links analysis).[6]

More importantly, the jury heard the recording of Vanegas *agreeing to transfer* to Clint the same drugs—cocaine and methamphetamine—that the officers found in Clint's pickup, and Clint could not have placed the drugs there because he and his pickup were searched upon his arrival at Wal-Mart. Vanegas apparently asks us conclude that following Clint's call to him specifically requesting drugs, his appearance at the same Wal-Mart described in the call on the same day as the call still cannot link to him to the custody or control of the same drugs requested in the call. We decline to make that conclusion, and the evidence does not indicate any alternate way that the drugs could have appeared in Clint's pickup.

Next, Vanegas cites a six-factor test that relates to when intent to deliver may be proved by circumstantial evidence. *See Garrett v. State*, 161 S.W.3d 664, 671 (Tex. App.—Fort Worth 2005, pet. ref'd); *Jordan v. State*, 139 S.W.3d 723, 726 (Tex. App.—Fort Worth 2004, no pet.). But here, Vanegas's

---

[6] Although our decision in *Tucker* listed fourteen affirmative links factors, and Vanegas's analysis focuses on those factors, the factors are not independent tests of evidentiary sufficiency, and they are not exclusive to the determination of whether evidence sufficiently links a defendant to drugs. *Id.*; *see Evans v. State*, 202 S.W.3d 158, 161 n.9 (Tex. Crim. App. 2006).

11

conversation with Clint and his admission to Roberts directly establish his intent. Also, Sergeant Davis testified that the amount of drugs he found in Clint's pickup is large enough to indicate an intent to distribute. He explained that just one gram of methamphetamine costs around $100 and that seven grams costs between $350 and $450. He stated that fifteen grams of cocaine costs between $400 and $600. Finally, the cocaine that the officers found was in "brick" form, which means that it could have been "broken off a kilogram" for further distribution.

We hold that a jury could rationally find that Vanegas intended to distribute cocaine and methamphetamine to Clint. Thus, we overrule Vanegas's legal sufficiency challenge in his first issue. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789.

In Vanegas's second issue, regarding factual sufficiency, he theorizes that someone may have placed cocaine and methamphetamine in Clint's truck from the time it was initially searched by Officer Norie to the time the drugs were found in the truck upon his arrival at the Wal-Mart. He argues that the evidence "plausibly suggested that Clint Dart arranged for the drugs to be placed in his truck in the two hours before [Vanegas] arrived on the scene." But testimony indicated that several officers watched the Wal-Mart parking lot from the time

12

Clint arrived there, at approximately 2 p.m.,[7] until the time Vanegas arrived, at around 4 p.m.

Based on Vanegas's statements in the phone recording and to Roberts, his compliance with the intention he expressed in the recording, and the remaining facts and circumstances detailed above, we hold that the evidence is not so weak that the jury's decision to convict him was clearly wrong and manifestly unjust. *See Lancon*, 253 S.W.3d at 704. Thus, the evidence is factually sufficient to support Vanegas's convictions, and we overrule his second issue.

### Vanegas's Request for Different Counsel

At the beginning of the trial on October 6, 2008, the following exchange occurred between the trial judge and Vanegas:

> THE DEFENDANT: I would like to ask for a little more time to retain a lawyer. I mean, what I'm saying is I don't wish to proceed with this -- with this trial with Mr. Adame.
>
> THE COURT: Okay. Well, Mr. Vanegas, you applied for a court-appointed attorney, you asked for a court-appointed attorney, you got a court-appointed attorney. And you can't wait until the day of trial and thereby manipulate the system and postpone your case to come in and say that you want a different attorney. If you had a different attorney that you hired here today and ready to go, then we would -- then that would be certainly your choice, and we

---

[7] Clint placed his call to Vanegas at 2:05 p.m. inside the McDonald's restaurant.

13

would proceed with that attorney. But I'm not going to postpone this case.

THE DEFENDANT: Okay.

THE COURT: Mr. Adame is more than capable of representing you in this case, and you just need to cooperate with him, because, you know, this affects you more than anybody.

THE DEFENDANT: Okay. I was set for another -- for a court date on the 26th, I believe. And I was never called out for it. And, I mean, Wednesday, you know, he comes to see me and tells me I have a trial Monday. So . . .

THE COURT: Okay. Well, you signed off on a pass slip back on July the 3rd. Well --

. . . .

THE DEFENDANT: No, I was not told the specific date. He told me in October but not on this specific date.

THE COURT: Okay.

THE DEFENDANT: Until last week.

THE COURT: Well, you don't have another attorney here to represent you. Is that correct?

THE DEFENDANT: Not today, ma'am.

THE COURT: Okay. And, well, we're going to proceed with Mr. Adame, so I just -- like I said before, I suggest that you confer with him and help him in your defense in this case, because we're about to seat a jury and we're about to proceed with this trial. We can't postpone it on the day of trial.

14

Vanegas contends in his third issue that the trial court abused its discretion and violated his constitutional rights by refusing his request for additional time to retain trial counsel of his choice. He equates his third issue to a challenge of a denial of a motion for a continuance.

**Standard of review and applicable law**

The denial of a motion for continuance is within the sound discretion of the trial court, and our review of the denial of the motion is limited to whether the trial court abused that discretion. *Renteria v. State*, 206 S.W.3d 689, 699 (Tex. Crim. App. 2006); *Janecka v. State*, 937 S.W.2d 456, 468 (Tex. Crim. App. 1996), *cert. denied*, 522 U.S. 825 (1997); *Williams v. State*, 172 S.W.3d 730, 733 (Tex. App.—Fort Worth 2005, pet. ref'd). A defendant must show "specific prejudice to his defense" to establish that the trial court abused its discretion by refusing to grant a continuance. *Renteria*, 206 S.W.3d at 699; *Janecka*, 937 S.W.2d at 468. Examples of specific prejudice include unfair surprise, an inability to effectively cross-examine witnesses, and the inability to elicit crucial testimony from potential witnesses. *Janecka*, 937 S.W.2d at 468.

The federal and Texas constitutions guarantee the right to counsel in criminal cases and contemplate the right to obtain paid, nonappointed counsel of the defendant's choosing. *United States v. Gonzalez-Lopez*, 548 U.S. 140,

15

151–52, 126 S. Ct. 2557, 2565–66 (2006); *Gonzalez v. State*, 117 S.W.3d 831, 836–37 (Tex. Crim. App. 2003). But the right to counsel of the defendant's choosing is not absolute, and Texas courts have consistently noted that a defendant cannot wait until the day of trial to demand different counsel or to request that counsel be dismissed so that he may retain other counsel. *Gonzalez*, 117 S.W.3d at 837; *Webb v. State*, 533 S.W.2d 780, 784 (Tex. Crim. App. 1976) (explaining that an "accused's right to represent himself or select his own counsel cannot be manipulated so as to obstruct the orderly procedure in the courts or to interfere with the fair administration of justice").

In deciding whether to grant a continuance because of the absence of the defendant's choice of counsel, the trial court should weigh the following factors: (1) the length of delay requested; (2) whether other continuances were requested and whether they were denied or granted; (3) the length of time in which the accused's counsel had to prepare for trial; (4) whether another competent attorney was prepared to try the case; (5) the balanced convenience or inconvenience to the witnesses, the opposing counsel, and the trial court; (6) whether the delay was for legitimate or contrived reasons; (7) whether the case was complex or simple; (8) whether the denial of the motion resulted in some identifiable harm to the defendant; and (9) the quality of legal representation actually provided. *Ex parte Windham*, 634 S.W.2d 718, 720

16

(Tex. Crim. App. 1982). We must determine whether the trial court could reasonably have balanced these factors and concluded that the fair and efficient administration of justice weighed more heavily than Vanegas's right to counsel of his choice. *See Greene v. State*, 124 S.W.3d 789, 794 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd).

**Analysis**

Here, Vanegas had from May 2008, when he was indicted, until October 2008, the time of his trial, to retain counsel. But in those six months, he failed to do so. And although he knew in July that his trial would begin in October, he waited until the day of trial to request more time to retain different counsel. Although no formal motions for continuance were filed, the record contains "COURT SETTING" documents indicating that Vanegas's case was passed three times. Vanegas's appointed counsel, Derek Adame, represented Vanegas at least since June 2008, so he had at least five months to prepare for trial. Vanegas admitted that no other attorney was ready to try the case, and the record does not indicate how long it would have taken Vanegas to retain counsel. Finally, although Vanegas contends that his appointed counsel did not promptly file certain motions, he has not raised any error connected to such motions, he has not contended that his appointed counsel was ineffective, and

17

he has not identified any particular strategic decision or other act of his appointed counsel that could have changed the result of his case.

For all of these reasons, we hold that the trial court did not abuse its discretion by denying Vanegas's motion for continuance to secure counsel of his choice. *See Renteria*, 206 S.W.3d at 699; *Webb*, 533 S.W.2d at 784. Thus, we overrule his third issue.

**The Trial Court's Decision to Admit Roberts's Testimony**

In his fourth issue, Vanegas contends that the trial court abused its discretion by admitting Roberts's (the CPS investigator's) testimony because Roberts did not provide Vanegas with any *Miranda* warnings before questioning him. *See Miranda v. Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 1630 (1966).

**Standard of review**

We review for an abuse of discretion a trial court's decision to admit testimony of a CPS worker when the defendant challenges the testimony under *Miranda*. *See Berry v. State*, 233 S.W.3d 847, 856 (Tex. Crim. App. 2007); *Wilkerson v. State*, 173 S.W.3d 521, 524 (Tex. Crim. App. 2005). Under that standard, we must affirm the trial court's decision to admit the testimony if the decision is within a zone of reasonable disagreement. *See Berry*, 233 S.W.3d at 858; *Shuffield v. State*, 189 S.W.3d 782, 793 (Tex. Crim. App.), *cert.*

*denied*, 549 U.S. 1056 (2006); *Moore v. State*, 233 S.W.3d 32, 40 (Tex. App.—Houston [1st Dist.] 2007, no pet.).

**Applicable law**

The United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. As a corollary to that provision, the United States Supreme Court held in *Miranda* that

> when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized. Procedural safeguards must be employed to protect the privilege and unless other fully effective means are adopted to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored, the following measures are required. He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Opportunity to exercise these rights must be afforded to him throughout the interrogation. After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement. But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him.

*Miranda*, 384 U.S. at 478–79, 86 S. Ct. at 1630. However, the Court limited its holding to custodial interrogation by "law enforcement officers." *Id.* at 444,

19

86 S. Ct. at 1612. And the cases at issue in *Miranda* each involved "incommunicado interrogation of individuals in a police-dominated atmosphere." *Id.* at 445, 86 S. Ct. at 1612; *see also Cobb v. State*, 85 S.W.3d 258, 263 (Tex. Crim. App. 2002) (explaining that the Fifth Amendment and the *Miranda* decision guard "against coercive custodial questioning *by police*[,]" therefore protecting defendants "from the possibility of physical or psychological 'third degree' procedures") (emphasis added), *cert. denied*, 537 U.S. 1195 (2003).

The court of criminal appeals has twice recently considered the application of *Miranda*'s requirements to CPS employees' custodial interviews of defendants. *See Berry*, 233 S.W.3d at 854–56; *Wilkerson*, 173 S.W.3d at 523–33. In *Wilkerson*, a CPS investigator had interviewed a defendant about the removal of his three children from the defendant's home a day after he was arrested for injury to a child by placing the child into scalding water and by hitting another child with a belt. *Wilkerson*, 173 S.W.3d at 523–24. The investigator "needed to discuss the children's placement in a foster home because there were no other parents or family members to care for them." *Id.* at 524. At trial, the defendant objected to the investigator's testimony regarding the defendant's incriminating admissions to the investigator, but the trial court denied the objection. *Id*. at 525.

In reviewing this court's decision to reverse one of the defendant's convictions based on the trial court's decision to admit the testimony, the court of criminal appeals considered when a CPS investigator becomes "a police surrogate for purposes of *Miranda* warnings when the person she interviews is in custody." *Id.* at 526. The court explained,

> Although state employment clearly makes a person an "agent of the State," that label does not, by itself, make the person an "agent of the State" for the purpose of defining "custodial interrogation." Not all government workers must be familiar with and ready to administer *Miranda* warnings . . . . [W]hen "the official has not been given police powers, *Miranda* has been held inapplicable to questioning by school officials, welfare investigators, medical personnel, prison counselors, and parole or probation officers.
>
> . . . .
>
> . . . [CPS workers'] mission is to protect the welfare and safety of children in the community. Although this duty may at times entail the investigation of child abuse claims, that alone does not transform CPS workers into law enforcement officers or their agents. . . . If the obligation to report suspected child abuse by itself could convert a CPS worker into a law enforcement agent, then every person who suspects child abuse could be called a "law enforcement agent" in the *Miranda* context. This is clearly not the law, and it was certainly not the purpose of the prophylactic *Miranda* warnings.

*Id.* at 528–29 (citations and footnotes omitted). However, the court cautioned that in some circumstances, *Miranda's* requirements may apply to a CPS investigator's questioning:

21

[I]f the once-parallel paths of CPS and the police converge, and police and state agent are investigating a criminal offense in tandem, *Miranda* warnings . . . may be necessary. At this point, a CPS worker may be viewed as an agent of the police. *The term "agency" denotes a consensual relationship which exists between two persons or parties where one of them is acting for or on behalf of the other. The law does not, however, presume an agency relationship. The person alleging such a relationship has the burden of proving it.*[8] But if a defendant does prove that a particular person—whether CPS caseworker, teacher, preacher, probation officer, or mere family friend—is, in fact, working for or on behalf of the police by interrogating a person in custody, that agent is bound by all constitutional and statutory confession rules, including *Miranda*.

*Id.* at 529–30 (footnotes omitted and emphasis added). The court instructed that in determining whether a CPS investigator's path is parallel to or converges with police purposes, courts should consider the "actions and perceptions of the parties involved: the police, the CPS caseworker (or other potential agent of the police), and the defendant himself." *Id.* at 530. The court expounded,

First, courts should look for information about the relationship between the police and the potential police agent. Did the police know the interviewer was going to speak with the defendant? Did the police arrange the meeting? Were the police present during the interview? Did they provide the interviewer with the questions to ask? Did they give the interviewer implicit or explicit instructions to get certain information from the defendant? Was there a "calculated practice" between the police and the interviewer that

---

[8] The urging of a motion to suppress does not thrust a burden on the State to show compliance with *Miranda* warnings unless the defendant proves that the statements he wishes to exclude were the product of custodial interrogation. *Id.* at 532.

22

was likely to evoke an incriminating response from defendant during the interview?  And finally, does the record show that the police were using the agent's interview to accomplish what they could not lawfully accomplish themselves?  In sum, was law enforcement attempting to use the interviewer as its anointed agent?

Second, courts should examine the record concerning the interviewer's actions and perceptions:  What was the interviewer's primary reason for questioning the person?  Were the questions aimed at gaining information and evidence for a criminal prosecution, or were they related to some other goal? How did the interviewer become involved in the case?  Did the interviewer help "build a case" that led to the person's arrest, or was the interviewer pursuing some other goal or performing some other duty?  At whose request did the interviewer question the arrestee? In sum, did the interviewer believe that he was acting as an agent of law enforcement?

Finally, courts should examine the record for evidence of the defendant's perceptions of the encounter.  When the defendant was interviewed, did he believe that he was speaking with a law-enforcement agent, someone cloaked with the actual or apparent authority of the police?  What gave him this impression? Alternatively, would a reasonable person in defendant's position believe that the interviewer was an agent of law enforcement?

At bottom, the inquiry is:  Was this custodial interview conducted (explicitly or implicitly) on behalf of the police for the primary purpose of gathering evidence or statements to be used in a later criminal proceeding against the interviewee? Put another way, is the interviewer acting as an "instrumentality" or "conduit" for the police or prosecution?  Most simply:  is the interviewer "in cahoots" with the police?

*Id.* at 530–31 (footnotes omitted).

The record in *Wilkerson* did not demonstrate any police involvement in the CPS investigation and did not show any of Wilkerson's perceptions of the investigation, and the CPS investigator's mere communication with police after speaking with Wilkerson did not transform the investigator into a law enforcement agent. *Id.* at 532–33. Thus, the court held that the trial court did not abuse its discretion by admitting the investigator's testimony, reversed our decision, and affirmed the trial court's judgment. *Id.* at 533.

Two years later, in *Berry*, the court of criminal appeals again addressed the admissibility under *Miranda* of a defendant's custodial statements made to a CPS employee. *Berry*, 233 S.W.3d at 854–56. The court relied on its *Wilkerson* opinion to hold that because the record in *Berry* (1) did not reflect that the CPS employee questioned Berry at law enforcement's request; (2) indicated that the employee talked to Berry for reasons related to the removal of a child and the child's placement; and (3) contained testimony from the employee that she was "not there doing an investigation," the trial court did not abuse its discretion by admitting the employee's testimony regarding Berry's incriminating statements. *Id.* at 855–56. Intermediate appellate courts reviewing factual circumstances like those in *Wilkerson* have held that similar testimony is admissible. *See Moore*, 233 S.W.3d at 38–43.

24

**Analysis**

Here, the trial court conducted a brief hearing outside of the jury's presence regarding the admissibility of Roberts's testimony. Roberts said that he met with Vanegas on the day of Vanegas's arrest in the Denton County Jail's arraignment room. When asked why he went to speak with Vanegas, Roberts answered, "[CPS] had received a call from [the] Denton County Sheriff that Mr. Vanegas had been arrested for selling, I think it was, methamphetamine and cocaine, and at the time of the arrest his child was in the back seat of the car."

Roberts said that according to protocol established by a CPS handbook, he identified himself as an employee of CPS to Vanegas, explained the reason for CPS's investigation (Vanegas's bringing his child to the Wal-Mart during the drug delivery and the child's placement), and explained the nature of the interview. Roberts testified, "I explained to [Vanegas] that there had been a call to CPS, that I was under the impression that he had been arrested that day with a child present, and at that point there was nobody to release the child to."

An officer accompanied Roberts during his interview with Vanegas; Roberts said that he "believe[d] it was one of the investigative officers, but [he was] not sure." Roberts could not remember whether the officer was in

25

uniform, and Roberts said that the officer was there for the "only reason" of ensuring Roberts's safety; he explained, "[The officer] stayed in the room because Mr. Vanegas was a prisoner at the time, so he couldn't leave me alone in that room."

The officer stood across the arraignment room from Vanegas and Roberts, and the officer did not communicate with Roberts during the interview or involve himself at all in the interview. When the State's prosecutor asked Roberts directly whether the officer involved "himself in [Roberts's] investigation with Mr. Vanegas whatsoever," Roberts responded, "Not in any way."

Vanegas admitted to Roberts that he went to Wal-Mart to make a delivery. Roberts testified that he interviewed Vanegas for "the safety of the child," not to help law enforcement, because "[t]hat's a totally separate thing." He said he was not a part of the police investigation and that his "only interest [was] the child and the CPS investigation." Roberts talked with Vanegas about facts other than those involving his drug delivery; for example, Roberts gathered Vanegas's background information.

At the end of Robert's testimony outside of the jury's presence, Vanegas urged a motion to suppress, arguing that although it was "clear that Mr. Roberts in the job he's doing is not a police officer," Roberts was "basically

acting as an agent of the State" to circumvent *Miranda*. Vanegas's counsel contended,

> If this person, the arresting officer, was not present, if they had taken pains to make sure that these two men were alone, then I don't think I would have an argument there. But the problem here is essentially the State has been allowed to recruit this civilian to act as their agent to ask the questions they would like to ask and get around [*Miranda*].

The trial court denied Vanegas's motion to suppress, stating that there was "no evidence . . . that this witness was recruited by the law enforcement agent or that the law enforcement agent directed him in his conversation with [Vanegas]."

Vanegas relies heavily on the fact that an officer was present during Roberts's interview, but the record contains no evidence that, as relevant under *Wilkerson*, the officer arranged Robert's meeting with Vanegas, provided any questions to ask, gave any instructions, or otherwise had any agreement or consent with Roberts at all regarding the interview other than to provide safety. And although Vanegas did not testify regarding his perception of the interview, we conclude that a reasonable person in his position, considering Roberts's instructions to Vanegas, the officer's lack of participation in the interview, and the officer's positioning in the arraignment room, would not have believed that Roberts was law enforcement's agent. *Wilkerson*, 173 S.W.3d at 530–31.

27

There is simply nothing in the record to indicate that Roberts was "in cahoots" with law enforcement, and Roberts's testimony affirmatively demonstrates otherwise. Therefore, we hold that the trial court did not abuse its discretion by deciding to deny Vanegas's motion to suppress and admit Roberts's testimony because Vanegas has not satisfied his burden of proving any agency relationship between Roberts and law enforcement's criminal investigation. *See Wilkerson*, 173 S.W.3d at 524, 529. We overrule Vanegas's final issue.

**Conclusion**

Having overruled all of Vanegas's issues, we affirm the trial court's judgment.

TERRIE LIVINGSTON
JUSTICE

PANEL: LIVINGSTON, MCCOY, and MEIER, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: October 8, 2009

28